IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| VASILY KOBEL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 08-986-KI |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| CITY OF PORTLAND, JAMES | ) | |
| BOTAITIS, STEVEN WUTHRICH, and | ) | |
| DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

Steven J. Sherlag
Attorney at Law
621 SW Morrison Street, Suite 900
Portland, Oregon  97205

    Attorney for Plaintiff

William W. Manlove
Office of City Attorney
1221 SW Fourth Avenue, Room 430
Portland, Oregon  97204

    Attorney for Defendants

Page 1 - OPINION AND ORDER

KING, Judge:

Plaintiff Vasily Kobel alleges claims of constitutional violations and tortious conduct against Portland police officers and the City of Portland.  The officers arrested Kobel, who speaks little English and suffers from dementia, when Kobel went to his son's construction site late in the evening to clean up debris.  Kobel alleges constitutional claims against the City for failure to train and against the individual officers for excessive force, unlawful detention, deprivation of due process, and unreasonable search and seizure.  He alleges common law claims for assault and battery, intentional infliction of emotional distress, and negligence.  Before the court is Defendants' Motion for Partial Summary Judgment (#28).  For the reasons below, I grant the motion in part and dismiss the inadequate training constitutional claims, as well as the related portions of the negligence claims.

## FACTS

I.    The Detention[1]

At the time of the incident, Kobel was a 63-year-old man who was being treated for pre-senile dementia and memory loss.  Kobel's son was building two houses.  The son asked Kobel to assist him by cleaning up the construction debris at 2701 SE 136th Avenue in Portland, Oregon ("Site").  At 10:00 or 11:00 PM on August 27, 2006, Kobel left his home and took his son's car to the Site to clean up debris.  He did not tell his wife or son that he was going and was dressed in shorts and a white T-shirt.  When Kobel got to the Site, he started picking up the wood and putting it in the car.

---

[1]  Because I decline to rule on whether there was reasonable suspicion to detain Kobel in a *Terry* stop, I only give enough facts about the detention to provide background for the training issues.

At 11:59 PM that night, a police dispatcher told Portland Police Officers Botaitis and Wuthrich that a 911 caller reported two people taking supplies from the Site.  The 911 caller lived next door to the Site and gave his name, address, and phone number.  The dispatcher told the officers that the suspect, a white male in a white T-shirt, was putting lumber in a car at the Site.  The officers knew there was a history of construction thefts in the area.

At approximately 12:02 AM, the officers arrived at the Site and saw Kobel, dressed in a white T-shirt, loading plywood into a car.  The officers, who were in uniform, approached Kobel and asked for his identification.  Kobel gave his license to them.  Kobel, who was born in the Ukraine, speaks Romanian, Ukrainian, Russian, and some English.  He told the officers, "My son property.  I make clean." Kobel Decl. at 26.

As soon as the officers started talking to Kobel, Wuthrich thought that Kobel either had a mental illness or was under the influence of alcohol or drugs.

Based on the dispatcher's information, the officers believed that a second suspect was nearby.  They decided to take Kobel into custody and handcuffed him.  The officers tossed Kobel to the ground, kicked him, hit him with a whip, tasered him, and gassed him.  The officers then took Kobel to the police car.  Other officers arrived to search for the second suspect.  One of them, Officer Pirv, speaks Romanian, Kobel's native language, but Pirv never spoke to Kobel.

Botaitis asked the dispatcher to check for an officer on duty who could speak Russian. The dispatcher found such an individual, Officer Hughes, and put him in communication with Botaitis on a cell phone.  Botaitis thought Kobel might have a mental health issue when Hughes said Kobel was providing strange responses.  Hughes admits his Russian language skills are diminishing through lack of use.

Page 3 - OPINION AND ORDER

Wuthrich took Kobel to East Precinct and put him in a holding cell.  Botaitis tried to locate the owner of the Site.  After he could not reach the owner on the phone, Botaitis drove to the owner's address and spoke to Kobel's son, Yakov Kobel, who confirmed he was Kobel's son but stated that he did not know Kobel was at the site.  Yakov Kobel took Botaitis to Kobel's house to speak to Kobel's wife.  She was also unaware that Kobel had left the house.  Yakov Kobel told Botaitis that his father suffered from a mental problem.  Botaitis picked Kobel up from East Precinct and released him to his family's care at about 1:55 AM.  Kobel was not charged with any crime.

II.    Training on Contacts with People Suffering from Age-Related Dementia

Officer Paul Ware has been the Portland Police Bureau's coordinator for Crisis Intervention Team ("CIT") training from 2002 until January 2007.  Ware provided information on training provided by the Bureau concerning mental health issues.

Ware reports that all Portland officers receive crisis intervention training at the Basic Academy, at the Advanced Academy, and at some of the yearly in-service training sessions if crisis intervention is selected as a topic.  All officers at the Basic Academy receive four hours of training on recognizing signs of various mental health disorders and learning techniques to interact with people experiencing mental health problems.  The Advanced Academy training focuses on an overview of mental illness and suicide awareness and lasts eight or nine hours.

Some officers take the Bureau's 40-hour course on crisis intervention and become a certified member of the CIT.  The CIT course is taught mostly by medical doctors and social workers in the mental health field.  It provides instruction on:  an overview of mental illness, cognitive disorders, thought disorders, mood disorders, post traumatic stress disorder, dual

diagnosis issues, personality disorders, the rights of the mentally ill, mental status exams, common medications, resource panels, cultural response panel, crisis intervention, the crisis cycle, and suicide intervention.  The training includes role playing and site visits to treatment or residential facilities for the mentally ill.  While Ware was CIT training coordinator, the Bureau met its goal of having one-third of the patrol officers and sergeants successfully complete the 40-hour CIT course to become designated as CIT officers.  The Bureau attempted to spread these officers throughout the five precincts and three shifts.

As coordinator for CIT training, Ware designed and taught training sessions on mental health awareness and developmental disabilities at the Bureau's yearly in-service training for current officers and Advanced Academy classes for new officers.  Ware reviewed police reports to compile statistics on police calls involving people in crisis and provided the Chief of Police with year-end reports describing the Bureau's involvement in calls relating to crisis intervention.  He also met with officers in all precincts to learn more about the nature of the calls involving people in crisis.  Ware attended national seminars in 2005 and 2006 related to police crisis intervention and chaired the Bureau's Crisis Intervention Advisory Board.

At the 2004-2005 yearly in-service training for all officers, the Bureau presented a two-hour course on crisis intervention which included the signs of major mental illnesses, the warning signs for suicidal behavior, and the benefits of verbal de-escalation techniques that could be used during encounters with people suffering mental health crises.

When Ware was the Bureau's CIT coordinator, he did not include any specific mental conditions related to age-related dementia in the training programs he designed.  Ware did not focus on these conditions for several reasons.  The Bureau has limited resources so the training

needed to be focused on the frequently reoccurring conditions that officers were likely to encounter. Officers frequently encountered schizophrenia, post traumatic stress disorder, suicidality, major mood disorders, and drug or alcohol use. Ware was aware of the nature of the police calls based on his reviews of records and interviews with officers, described above. Ware's data from Portland was corroborated by information he learned at the national CIT conferences that less than five percent of crisis intervention calls nationally were related to issues involving aging-related conditions. Conference speakers explained that societal change had de-institutionalized many of the mentally ill, making them a more visible population which had more contacts with police. In contrast, most elderly people with age-related mental conditions are supervised by family members at home or in a residential care facility so they have few contacts with police. Furthermore, Ware believes the skills taught for contacts with people suffering from mental illness would transfer to contacts with people suffering from age-related dementia.

The Bureau keeps a Crisis Intervention database with information from police reports. The database contains 14,383 entries for reports between December 1, 1998 and the date of the incident with Kobel, August 28, 2006. Approximately 25 of those police reports[2] contained one of the words dementia, demensia [sic], elder, elderly, geriatric, Alzheimer, aging, older, or old.

John Tellis, Commander of the Bureau's Training Division, explains that the Bureau has a Disability Accommodation Registry ("DAR") program in which people can register if they have severe developmental disabilities, brain injuries, or mental illnesses which could cause

---

[2] Plaintiff's search of the database uncovered 26 reports and defendants' search found 24 reports. The discrepancy is too small to change the analysis.

communication problems in a police encounter.  Kobel is not registered in the DAR.  The Bureau

also teaches officers to look for identifying bracelets from the national Safe Return registry for

people with dementia so that the officers can contact the person's family.  Training Bulletins

were distributed in 1994, 1996, 1998 and 1999 concerning missing persons suffering from

dementia and about the registration programs.

III.    <u>Training on Contacts with People who have Limited English Proficiency</u>

Commander Tellis explains that the Bureau provides several resources for officers to use

when they encounter a person with limited English proficiency.  In August 2006, the resources

included the AT&T language line, fellow officers with foreign language skills, family or friends

at the scene who can translate, and nonverbal communication techniques.  Training Bulletins on

interpreter services were issued in 1996 and 1998.  Tellis believes the foreign language resources

are adequate to allow sufficient communication to occur for officers to determine the appropriate

course of action.

Frances Portillo teaches cross-cultural communication classes at each Advanced

Academy since 1996, after teaching the class at the 1994-1995 in-service training.  Her course

emphasizes that culture is comprised of 14 different cultural categories–such as gender, age,

abilities, religion, ethnicity, and profession–and that language is a characteristic of all categories.

Portillo believes that her class would help officers interact with people with limited English

proficiency by being more aware of different communication styles and role-playing exercises in

which officers have to interview other officers who pretend to speak only a foreign language.

The Bureau distributes the Peace Officer's Pocket Reference Guide which, since 2005,

contains a foreign language reference table.  The table lists the phrase, "I am a police officer here

to help, please point to the language you speak[,]" in ten different languages.  An officer can ask someone with limited English proficiency to point to the language they understand, which would be the first step in arranging for an interpreter.

The Bureau has offered officers the opportunity to take other classes focused on particular immigrant groups in Portland.  In 1996, the Bureau hired a Russian-born American citizen, Marina Braun, to teach a two-hour class once a week for a year on how to communicate with Russian speakers.  Braun emphasized the local Russian community's attitude towards institutions and people of authority.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The initial burden is on the moving party to point out the absence of any genuine issue of material fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party.  Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.      Detention of Kobel

Defendants concede that there are disputed issues of fact concerning whether Kobel's detention was transformed into an arrest, whether there was probable cause to support an arrest, and whether the officers' use of force was reasonable.  In spite of this concession, defendants

seek a summary judgment ruling that the officers had reasonable suspicion to detain Kobel in a *Terry* stop. See Terry v. Ohio, 392 U.S. 1, 20-22 (1968). Kobel disputes that reasonable suspicion existed.

After considering the practicalities of the matter, I have decided not to rule on this issue prior to trial because I do not see how it would narrow the issues to be decided at trial. The jury would still have to determine the ultimate issue of whether the detention was transformed into an arrest, even if I conclude now that there was reasonable suspicion to support a *Terry* stop. Accordingly, defendants' motion for summary judgment on a portion of the illegal detention claim is denied.

II.    Failure to Train

Kobel alleges a *Monell* claim against the City based on the City's failure to properly train officers on how to interact with people suffering from age-related dementia or who have limited English proficiency.[3]

> [T]he Supreme Court, in essence, established a three-part test with respect to when the inadequacy of police training may serve as the basis for municipal liability under section 1983. First, it must be determined whether the existing training program is adequate. The adequacy of a particular training program must be resolved "in relation to the tasks the particular officers must perform." A training program will be deemed adequate if it "enable[s] officers to respond properly to the usual and recurring situations with which they must deal."

> Second, if the training program is deemed inadequate, it may justifiably be said to constitute a city policy. Such will be the case, however, "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." This heightened degree of culpability on the part of a municipality may be established when "the need for more or different

---

[3] Plaintiff's counsel clarified during oral argument that the *Monell* claim was limited to these two issues. The negligence claim consists of these two training issues, along with respondeat superior responsibility for the officers' conduct during the detention.

training is so obvious, and the inadequacy so likely to result in the violation of
constitutional rights, that the policymakers of the city can reasonably be said to
have been deliberately indifferent to the need."

       Finally, inadequate training that manifests a deliberate indifference on the
part of a municipality must be shown to have "actually caused" the constitutional
deprivation at issue.

Merritt v. County of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989) (quoting City of Canton v.

Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L. Ed. 2d 412 (1989)) (citations omitted).  Further,

"[m]ere proof of a single incident of errant behavior is a clearly insufficient basis for imposing

liability on the County."  Merritt, 875 F.2d at 770.

      A.    Age-Related Dementia

      For the first factor, the City argues that its training programs on age-related dementia are

constitutionally adequate.  The City relies on Training Bulletins about dementia and further

argues that skills taught in the CIT training which concern other mental conditions would transfer

to an interaction with a person suffering from dementia.  According to the City, the number of

interactions between officers and people with dementia is very small in comparison to the

number of interactions officers have with people suffering from other mental problems.  The City

maintains that plaintiff's expert's assertions on the number of contacts are not supported by any

data.

      Kobel contends that the age-related dementia training is not constitutionally adequate.

According to Kobel, the training did not train officers how to recognize dementia or how to deal

with people who suffer from it.  Kobel claims that Officers Wuthrich and Botaitis do not

remember any training they received on the issue and did not employ de-escalation techniques

used with other mental disorders.  Kobel notes that some of the training predated the hire of

Officers Wuthrich and Botaitis and that there are no guidelines on when an officer must call out a CIT-trained officer.

I first note that whether the officers violated Kobel's constitutional rights is a different question from whether the training is adequate. An officer can be adequately trained but still violate a person's constitutional rights by failing to properly employ the training. Likewise, a constitutionally sound training program can be negligently administered. Canton, 489 U.S. at 390-91. This undercuts Kobel's arguments based on the conduct of Botaitis and Wuthrich.

To determine the adequacy of the training on age-related dementia, I must look at the evidence of the tasks the officers perform in response to "the usual and recurring situations with which they must deal." Id. at 391.

The City provided both anecdotal and statistical evidence of how many police calls included interactions with people suffering from age-related dementia. Ware reported anecdotally, based on his discussions with officers and reviews of police reports, that fewer than five percent of crisis intervention calls fall within this category. Ware's anecdotal information was confirmed by information he collected at national CIT conferences. The Crisis Intervention database contained only 25 such contacts in 14,383 reports from a nearly eight-year period–only 0.17 percent of the calls.

Kobel notes that there is no record of his police contact in the Crisis Intervention database and argues that the court should consider the database worthless. Kobel's argument would be more persuasive if he provided evidence of other police contacts with people suffering from age-related dementia which were left out of the database, but he provides evidence of no other incidents. Adding one more incident has no practical effect on the frequency of the contacts. I

must conclude that such police contacts are quite rare. Thus, Kobel has failed to raise a factual issue that the training is inadequate, regardless of the content of training specifically focused on age-related dementia, because police contacts with people having this issue are not usual and recurring situations.

Turning to the second factor, the City maintains that Kobel cannot show that the City was deliberately indifferent to the rights of people with age-related dementia. The City claims that the need for different training was not obvious because the number of police interactions with this population is extremely limited. To establish deliberate indifference, the City claims that Kobel must show a pattern of tortious conduct sufficient to constitute notice. The City contends there is no evidence in the record of any incidents other than Kobel's own encounter. The City further argues that there is no obvious need to provide training on age-related dementia.

Kobel claims the record shows that police encounters with people suffering from age-related dementia occur often enough for officers to reasonably expect them. Kobel further contends that the City was aware of the risk of not effectively communicating with mentally-compromised people.

The deliberate indifference analysis turns on whether "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Canton, 489 U.S. at 390.

Based on the City's evidence on the number of police contacts with people suffering from age-related dementia, in comparison to the number of police contacts associated with crisis intervention, I reject Kobel's argument that this type of contact occurs often enough for officers

to reasonably expect it and for the City to be on notice that ignoring the issue would be deliberately indifferent to the need. Therefore, Kobel's deliberate indifference argument rests on his own encounter. In the Ninth Circuit, however, "[m]ere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability on the County." Merritt, 875 F.2d at 770.

Other circuits have joined the Ninth Circuit in looking for a pattern of incidents on which to base a deliberate indifference finding. For example, Gold v. City of Miami, 151 F.3d 1346, 1351-52 (11th Cir. 1998), reviewed plaintiff's evidence of deliberate indifference concerning use of the disorderly conduct statute to curb protected speech and the proper response to a prisoner's complaint that handcuffs were too tight. Plaintiff submitted evidence on the number of disorderly conduct arrests which were eventually dismissed but had no evidence on the reasons for the dispositions or whether any were due to false arrests for protected speech. Plaintiff proffered no evidence of prior incidents of injury from excessive force in handcuffing but provided evidence that other officers often loosened cuffs on request. Plaintiff also had evidence of one injury from handcuffing but made no showing that excessive force was involved. Id. at 1351. The Gold court reviewed the Supreme Court precedents:

> In City of Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), the Supreme Court in dictum left open the possibility that a need to train could be "so obvious," resulting in a City's being liable without a pattern of prior constitutional violations. Id. at 390, 109 S. Ct. 1197. As an example, the Supreme Court in City of Canton referenced the obvious need to train police officers on the constitutional limitations on the use of deadly force, when the city provides the officers with firearms and knows the officers will be required to arrest fleeing felons. Id. at 390 n.10, 109 S. Ct. 1197.
>
> Subsequently, in Board of County Commissioners v. Brown, 520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997), the Supreme Court characterized the City of Canton's leaving open such a possibility as simply hypothesizing in a

narrow range of circumstances that a plaintiff might succeed without showing a
pattern of constitutional violations, as follows:

> In leaving open in <u>Canton</u> the possibility that a plaintiff might succeed in carrying
> a failure-to-train claim without showing a pattern of constitutional violations, we
> simply *hypothesized* that, *in a narrow range of circumstances*, a violation of
> federal rights may be a highly predictable consequence of a failure to equip law
> enforcement officers with specific tools to handle recurring situations.  <u>Brown</u>, at
> [409], 117 S. Ct. at 1391 (emphasis added) (holding isolated incident of sheriff's
> inadequate screening of deputy did not create such an obvious risk that it alone
> established the municipality's deliberate indifference to the risk that the deputy
> would use excessive force).  In short, to date, the Supreme Court has given only a
> hypothetical example of a need to train being "so obvious" without prior
> constitutional violations: the use of deadly force where firearms are provided to
> police officers.  <u>See City of Canton</u>, 489 U.S. at 390 n.10, 109 S. Ct. 1197.

<u>Id.</u> at 1351-52; <u>see also</u> <u>Hirsch v. Burke</u>, 40 F.3d 900, 904-05 (7th Cir. 1994) (affirming

dismissal of inadequate training claim, after a bench trial, alleging inability to recognize

symptoms of diabetes from intoxication, resulting in the jailing for public intoxication of people

in insulin shock; plaintiff submitted no evidence of past incidents of mistaken arrests or failure to

medically treat these detainees, and consequently did not prove defendants were on notice of any

constitutional violations).

Kobel cites several Tenth Circuit cases to argue that he does not need to demonstrate a

pattern of incidents to prove deliberate indifference.  For example, <u>Brown v. Gray</u>, 227 F.3d 1278

(10th Cir. 2000), analyzed the police department's policy that officers are always on duty and

must always be armed, even when not working a shift.  The <u>Brown</u> court reasoned that to satisfy

the usual and recurring situation requirement, "[t]he situation need not be frequent or constant; it

must merely be of the type that officers can reasonably expect to confront."  <u>Id.</u> at 1288.

Assuming that the Tenth Circuit is interpreting the Supreme Court cases differently, <u>Brown</u> is

distinguishable on the facts from the situation before me because <u>Brown</u> had evidence that

Denver officers "are often alerted to suspected criminal behavior at some point when they are off-shift." Id. In contrast, the number of police contacts with people suffering from age-related dementia is rare. Moreover, the need to train for police encounters with people suffering from age-related dementia is far from as obvious as the Court's hypothetical of police officer's use of deadly force with their service weapons.

Kobel's expert, Howard Webb, gave an opinion that if the Bureau provided training in recognizing the symptoms of a person suffering from dementia, the officers would have been able to investigate without using physical force on Kobel. Webb did not analyze the number of police contacts with such people. Instead, he opined:

> With a metro police department of almost one-thousand officers that provides public safety services to a community with a population of over five-hundred thousand citizens, the policy-makers of the Portland Police Bureau are certainly aware that their officers will encounter elderly persons who have special needs regarding age related mental illness and physical limitations. Consequently, the Police Bureau is legally and morally obligated to provide effective training that protects the rights and physical safety of its older community members.

Webb. Decl. ¶ 30. Webb does not base his opinion on evidence of the number of elderly people who have any police encounters, regardless of their mental state. He also fails to recount incidents other than Kobel's. Although we can all agree that there are many elderly in the community, it is not a given that they come into contact with police more than on rare occasions. The Crisis Intervention database, collecting actual police report information, contradicts Webb's unsupported opinion. Webb's opinion is similar to the expert opinion in Conner v. Travis County, 209 F.3d 794 (5th Cir. 2000), in which the court held that plaintiff failed to show deliberate indifference to medical problems suffered by people who have had strokes prior to a

police encounter.  Plaintiff's argument was based on his expert's opinion and plaintiff's own

arrest and inability to take his medication in jail.  Rejecting plaintiff's argument, the court stated:

> Instead, the Conners' showing of a need to train was premised on the testimony of their expert witness, who claimed, without citing underlying data, that detainees with stroke symptoms would present themselves so frequently that County staff should be trained to recognize them.  By itself this is unpersuasive. We have previously noted that plaintiffs generally cannot show deliberate indifference through the opinion of only a single expert, and this witness's testimony was little more than his opinion.

Id. at 798 (citation omitted).  For the same reason, Webb's opinion fails to raise a factual issue.

I also distinguish Russo v. City of Cincinnati, 953 F.2d 1036 (6th Cir. 1992), cited by

Kobel to argue that cities cannot shield themselves from liability by "offering a course nominally

covering the subject, regardless of how substandard the content and quality of that training is."

Id. at 1047.  The officers in Russo, however, "conceded that they were frequently called upon to

deal with mentally and emotionally disturbed and disabled individuals."  Id. at 1036.  The only

evidence before me is that police contacts with people suffering from age-related dementia is

rare, thus reducing the need for training focused on the issue.

In sum, Kobel has failed to show a material issue of fact remains:  (1) that the Bureau's

training on police contact with people suffering from age-related dementia is inadequate; and

(2) that the Bureau was deliberately indifferent to the rights of these people.  I grant summary

judgment and dismiss the Monell and related negligence claims on this failure to train issue.

> B.      Limited English Proficiency

The City does not argue that few people with limited English proficiency interact with

police.  Instead, it contends that its training is constitutionally adequate because officers are

trained on the use of various available resources.  According to the City, police encounters are

not uniform and unvarying, causing the City to provide various tools which the officer can use depending on the circumstances.

Kobel argues that the training only advises officers of the available resources and then sends them onto the street without any meaningful guidance or policies.  He claims that the lack of a policy or standardized response for interactions with people with limited English proficiency shows that the training for the issue is inadequate.

I decline to address whether the training is constitutionally adequate because the deliberate indifference prong of the test is dispositive here.

The City maintains that Kobel cannot show that the City was deliberately indifferent to the need for more training on interactions with people who have limited English proficiency.

Kobel argues that there is evidence the City was aware that effective communication is crucial because lack of a common language can lead to an escalation of behaviors resulting in injury.

Other than Kobel's own incident, however, there is no evidence in the record that the current level of training, essentially explaining the available resources to officers, has led to any problems.  There is no record of greater levels of force being used against suspects than would be necessary if the officers could communicate better.  Likewise, there is no record of arrests in which the suspect was soon released after better communication established that the arrest was mistaken.  Thus, there is no factual issue that the need for more or different training is obvious.  There is also no factual issue that any inadequacy is likely to result in the violation of constitutional rights.  Plaintiffs have failed to raise a factual issue that the City is deliberately indifferent to the rights of people who are not proficient in English.  Consequently, I grant

summary judgment and dismiss the *Monell* and related negligence claims on this failure to train

issue.  This results in the complete dismissal of all *Monell* claims and dismissal of all parts of the

negligence claims other than the parts based on respondeat superior.

## CONCLUSION

Defendants' Motion for Partial Summary Judgment (#28) is granted in part.  The *Monell*

claims and the portion of the negligence claims related to inadequate training are dismissed with

prejudice.

IT IS SO ORDERED.

Dated this _____16th_____ day of November, 2009.


   _/s/ Garr M. King_____
   Garr M. King
   United States District Judge